IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| Kindred Hospitals East, LLC ) | | |
| d/b/a/Kindred Hospital-Kansas City ) | | |
| d/b/a/Kindred Hospital- St. Louis ) | | |
| ) | | |
| Plaintiff, ) | No. 10-00073-CV-W-HFS | |
| v. ) | | |
| Kathleen Sebelius, Secretary of the ) | | |
| United States Department of Health and ) | | |
| Human Services, ) | | |
| ) | | |
| Defendant. ) | | |

ORDER

This is a dispute over the Medicare cost report treatment of funds two hospitals ("Kindred") received from a privately administered pool fund. The Administrator found that the hospitals should have reduced their tax expense by the amounts they received from the pool fund on their Medicare cost reports for the years 2000-2003. The hospitals disagree, and this appeal followed.

**Background of Medicare**

The Medicare program provides health insurance to the aged and disabled. It is administered by the United States Department of Health and Human Services through The Centers for Medicare and Medicaid Services ("C.M.S."). C.M.S. contracts out the payment and audit functions of the Medicare program to insurance companies known as "fiscal intermediaries." 42 U.S.C. §§ 1395h, 1395kk-1. Fiscal intermediaries determine payment amounts due the providers under Medicare law and interpretive guidelines

published by C.M.S.  See 42 U.S.C. § 1395h; 42 C.F.R. § § 413.20, 413.24.

At the end of the fiscal year, the provider submits a Cost Report to its fiscal intermediary. The Cost Report shows the costs it incurred and the portion of those costs to be allocated to Medicare patients. 42 C.F.R. § 413.20. The fiscal intermediary reviews the Cost Report, determines the total amount of Medicare reimbursement, and issues a Notice of Program Reimbursement ("N.P.R.") 42 C.F.R. § 405.1803.

Reimbursement is based on "reasonable cost of the services." 42 U.S.C. § 1395f(b)(1). "Reasonable cost" is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used . . . " 42 U.S.C. § 1395x(v)(1)(A). The implementing regulations include as reasonable costs, "all necessary and proper costs incurred in furnishing the services, subject to principles relating to specific items of revenue and cost." 42 C.F.R. § 413.9(a).

In determining reasonable cost, 42 C.F.R. § 413.98 provides that total costs are reduced for purchase discounts, allowances, and refunds of expenses:

> (*a*)*Principle*. Discounts and allowances received on purchases of goods or services are reductions of the costs to which they relate. Similarly, refunds of previous expense payments are reductions of the related expense.
>
> *****
>
> (b)(3)*Refunds*. Refunds are amounts paid back or a credit allowed on account of an overcollection.
>
> ( c) *Normal accounting treatment - Reduction of costs*. All discounts, allowances, and refunds of expenses are reductions in the costs of goods or services purchased and are not income. . . .

The CMS Provider Reimbursement Manual also states that "Applicable credits" offset expenses:

> **§ 2302.5 Applicable Credits**
>
> Those receipts or types of transactions which offset or reduce expense items that are allocable to cost centers as direct or indirect costs. Typical examples of such transactions are: purchase discounts, rebates, or allowances; recoveries or indemnities on losses; sales of scrap or incidental services; adjustments or overpayments or erroneous charges; and other income items which serve to reduce costs.

Once the fiscal intermediary determines the amount of reimbursement, it issues a Notice of Program Reimbursement ("NPR") to the provider. 42 U.S.C. § 405.1803. The provider may appeal the reimbursement determination to the Provider Reimbursement Review Board. 42 U.S.C. § 1395oo; 42 C.F.R. § 405.1875.

**Background of Medicaid Program**

Medicaid is a combined Federal-State entitlement program which provides health and long-term care to low income individuals and families. 42 U.S.C. § 1396 *et. seq.* In general, each state designs and administers its own program and then receives reimbursement based on a financing formula from the federal government. Under the Medicaid Act, the federal government provides "matching funds" referred to as Federal Financial Participation (FFP) for a state's Medicaid expenditures. FFP is available only for state funds that are raised in a manner that conforms to the requirements of the Medicaid statute.

**Missouri's Federal Reimbursement Allowance Program**

Effective October 1, 1992, Missouri instituted a tax to fund its portion of the Medicaid

program, known as the Federal Reimbursement Assessment ("FRA"). <u>See</u> Mo. Rev. Stat. § 208.453. Congress authorized the tax under the Medicaid Voluntary Contribution and Provider - Specific Tax Amendments of 1991, 42 U.S.C. § 1396b(w). Under the FRA program, Missouri assessed a provider tax on all patients (including Medicare, private insurance and Medicaid). The FRA tax is an allowable health care related tax under the Medicare laws and regulations and is an allowable expense for Medicare reimbursement. The providers paid the FRA tax directly to the State by either check or as a reduction from their Medicaid reimbursement. Missouri law does not authorize a refund of FRA taxes. Mo. Rev. Stat. § § 208.453 *et. seq.*

**Private Contractual Pooling Arrangement**.

In the administrative proceedings, Kindred submitted as an exhibit a Missouri Hospital Association publication titled "FRA History and Background." (A.R. at 642). The publication explained the background of the pooling arrangement.

Before 1992, Missouri generated funds for its Medicaid program by using a voluntary contribution program. Under the voluntary program, hospitals that accepted Medicaid payments donated funds back to the State, which the State paid back to the hospitals in the form of additional Medicaid reimbursement, including Federal Financial Participation (matching funds). Because of the matching funds, all hospitals received payments in excess of their contributions.

The Medicaid Voluntary Contribution and Provider Specific Tax Amendments rendered Missouri's voluntary program ineffective in generating FFP. The Amendments permit matching funds to be generated by expenditures funded through a tax on hospitals but only if the tax is broad-based and uniform and only if it is not subject to a "hold

harmless" provision under which the amount of taxes paid by a hospital would be a factor in determining the amount of state payments to the hospital. 42 U.S.C. § 1396b(w)(1)(A). Under the Amendments, a state tax qualifying for FFP would have to meet two requirements. First, the tax would have to be imposed on all of the state's hospitals at a uniform tax rate. 42 U.S.C. § 1396b(w)(3). Second, the state's payments to a hospital could not be determined by the amount of tax paid by the hospital, and the state may not provide directly or indirectly for payments, offsets, or waivers that hold the hospital harmless for any portion of the tax. 42 U.S.C. § 1396b(w)(4).

The Missouri Hospital Association described the "dilemma:"

> The law's requirements of a broad-based and uniform assessment forced some hospitals to pay a tax substantially in excess of any benefit they would derive from the program. A review of the federal law led to the conclusion that hospital could engage in a pooling arrangement to mitigate the impact of a broad-based, uniform assessment. Under the pooling arrangement, funds are withheld from hospital that are winners under the program. Winners are defined as hospitals with certain designated Medicaid payments in excess of the FRA assessments. The withheld funds are transferred to hospitals that are losers. Losers are defined as hospitals with an FRA assessment in excess of their designated Medicaid payments. (A.R. at 642-43).

Because Missouri levied the FRA tax on all patients (including Medicare, Medicaid, and private insurance), hospitals with a high percentage of Medicaid patients received Medicaid reimbursement generated by the FRA tax that exceeded their FRA tax assessment while those hospitals that had a lower percentage of Medicaid and uninsured patients would pay more FRA tax than they would receive from Medicaid payments. In 1992, the year the FRA tax was imposed, the Management Service Corporation (MSC), a subsidiary of the Missouri Hospital Association, began administering the pooling

arrangement used by the providers in this case.   The stated purpose of the pooling contracts was to receive, consolidate, and distribute funds from the FRA program "for the purpose of enhancing the ability of Missouri hospitals to provide health care services to beneficiaries of [Medicaid] and to the uninsured." (A.R. at 785).

Under the pooling contracts, providers authorized the MSC to endorse and deposit Medicaid reimbursement checks received from Missouri into separate bank accounts maintained by each hospital.  The MSC then transferred these funds to a MSC pool account. According to the pool contracts, the pool funds were then distributed "according to formulas and instructions, which may change from time to time for various reasons."

The Medicaid reimbursement checks represented two categories of reimbursement. The first was "Medicaid Claims Payments," which consist of a per-diem reimbursement for Medicaid hospital services. This amount was passed back to the hospital and not included in the pooling arrangement. The second category of reimbursement consisted of certain types of supplemental payments based on uncompensated hospitals costs related to Medicaid beneficiaries and uninsured payments (commonly called "add-on payments"). The add-on payments went into the MSC pool. The MSC then used a formula to determine whether a hospital was "pool contributor" or a "pool recipient" by comparing, among other items, the Medicaid add-on payments to the FRA tax it paid. (A.R. at 60-68).  If a hospital's Medicaid add-on payments exceeded the FRA tax and minor additional charges, the hospital paid into the pool (pool contributor).   Conversely, if the hospital's Medicaid add-on payments were less than its FRA tax payments and minor adjustments, the hospital received payments from the pool (pool recipient).

The MSC calculated pool payments by first calculating each provider's percent of

contribution to the aggregate pool and then multiplying the percentage by the total amount of "losses" of the pool recipients.  A recap of the 24 MSC Accounting Reports showed that although there were month to month and even year to year deviations, the MSC pool formula resulted in providers being compensated by the pool for some, if not most, of the amount by which its Medicaid add-on payments fell short of FRA tax withholdings.[1] Although Kindred responds that the accounting years cannot be collapsed to make such a comparison, it is not the overall reduction that the Administrator found important, it was the relationship between the FRA tax incurred and the pool contribution received.

**Kindred Cost Reports**

The Kindred hospitals are Medicare-certified long-term acute care hospitals in Missouri.  For the years 2000 - 2003, Kindred received pool payments from the MSC. On its Medicare Cost Reports for fiscal years 2000 - 2003, Kindred claimed the FRA tax it paid as an allowable expense.  Kindred recorded the pool payments it received as revenue, reporting the MSC pool payments as a reduction of their Medicaid contractual allowance adjustment.[2]  The issue here is whether the pool payments should instead have

---

[1] The parties agree that a mathematical error exists in the 2002 Kindred-St. Louis Intermediary worksheet.  The "Net Payment from Pool" figure of $381,346 for the year ending 8/31/02 for Kindred -St Louis is significantly lower than the amount of $885,222 amount shown by the Intermediary.  The parties both agree that because payments from the pool for the periods ending 6/20//02 and 7/5/02 should have been shown on the Intermediary's worksheets as negatives (in parentheses) rather than as positives, a further adjustment to correct the mathematical error in favor of Kindred is in order.

[2] A Medicaid Contractual allowance is the amount by which a hospital's charges for services to Medicaid patients exceed the Medicaid reimbursement.  13 C.S.R. 70-15.010(2)(E).

been credited against the FRA tax payments - which would have significant financial results.

**Office of Inspector General Review**

On May 6, 2004, the Office of Inspector General for the Department of Health and Human Services issued a report entitled "Review of the Classification of Missouri Provider Tax Refunds on Hospitals' Medicare Cost Reports." (A.R. at 650). The OIG reviewed the Cost Reports of the 17 Missouri hospitals that purportedly received the largest pool payments. Citing 42 U.S.C. § 1861(v)(1)(A) and 42 C.F.R. § 413.98, the OIG determined that fifteen of the seventeen hospitals improperly classified the pool payments as Medicaid revenue, instead of reductions of their FRA tax expense. Following the OIG's recommendation, the CMS instructed the fiscal intermediaries to reopen the Cost Reports of the 15 hospitals and to make adjustments to reclassify the pool payments as tax refunds to be offset against the FRA tax expense. (A.R. at 652). Each of the Kindred hospitals were subject to adjustments for the years 2000- 2003. The adjustments exceeded 3.2 million dollars.

**Administrative Reviews**

Following the OIG report, the 2000 through 2003 Cost Reports were reopened and adjustments made to treat pool payments as an offset to the FRA tax expense as recommended by the OIG. Kindred appealed the disallowance to the Provider Reimbursement Review Board, which consolidated the six appeals for a single hearing. The Board issued a decision reversing the fiscal intermediary's adjustments, finding them inconsistent with the facts, Medicare laws, and program guidance. (A.R. at 34-46).

The CMS Administrator, however, reversed the PRRB's decision and reinstated the adjustments. The Administrator reviewed the history of the FRA tax program and mechanics of the pooling arrangement. The Administrator noted that the pooling arrangement allowed for a distribution of the increased funding that occurred as a result of the FRA tax based on the provider's tax burden, and created a redistribution methodology under which payment in excess of a hospital's FRA tax assessment would be paid back to those Missouri providers that did not receive Medicaid reimbursement in excess of their FRA tax assessment. (A.R. at 11 - 12). The Administrator relied on the Medicare "reasonable cost" rule (reimbursement based on costs actually incurred) and determined that the providers must offset their FRA tax expense by the pool payments it received. She went on to state: "the regulation at 42 C.F.R. § 413.98(a) states that refunds of previous expense payments are reductions (offsets) of the related expense." The Administrator rejected the argument that the pool payments were donations or unrestricted grants from one hospital to another as the pool payments were not unconditional.

Kindred now seeks review, arguing that the Administrator's decision is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence and contrary to law. In Home Health v. Shalala, 188 F.3d 1043, 1046 (8th Cir. 1999) (standard of review). This court must afford substantial deference to an agency's own interpretation of its own regulations, particularly in a case like this which involve "a complex and highly technical regulatory program such as Medicare, which requires significant expertise and entails the exercise of judgment grounded in policy concerns." Thomas Jefferson Univ. Hosp. v. Shalala, 512 U.S. 504, 512 (1994).

**Overcollection**

Kindred first argues that the Administrator's decision must be reversed because it is not in accordance with law. Kindred directs this court to the Administrator's statement that "the regulation at 42 C.F.R. § 413.98 states that refunds of previous expense payments (such as FRA taxes) are reductions (offsets) of the related expense." Kindred says that the pool payments cannot constitute a refund under the regulations because "refunds are amounts paid back or a credit allowed on account of an overcollection." 42 C.F.R. § 413.98(b). Absent an overcollection, Kindred argues, there can be no refund. Kindred also stresses that payments it received from the pool fund do not reduce the amount it paid in FRA taxes, and its tax expense should not be reduced by subsequent events between different parties.

The Administrator's decision does not rest on a strict definition of a refund. Instead, the decision rests on the more general ground that the pool payments reduced the actual cost incurred of the FRA tax. The Fifth Circuit rejected the overcollection requirement in Sta-Home Health Agency Inc. v. Shalala, 34 F.3d 305 (5th Cir. 1994). In that case, employees of a hospital donated a portion of their salary to the hospital under a payroll deduction. Id. at 307. The hospital deducted the employees' full salary cost on its Medicare cost report and the Secretary disallowed the donated portion of the salary on the ground that the contributions were "reductions or refunds of salary expense." Id. at 308. The Fifth Circuit rejected the hospital's argument that the contributed portion of the salary could not constitute a "refund" because there was no overcollection, calling the hospital's argument, "an artful grammatical analysis." Id. at 309.

Kindred argues that Sta-Home does not help the Administrator's position and in fact

hurts it because Sta-Home shows that the payer and payee must be the same in order for there to be an "overcollection" or an "amount paid back" under the regulations. Kindred continues that line of argument, stating that the regulations require that a discount, allowance, or refund be "granted or allowed by the payee in the transaction to which the cost reduction applies."

It is true that overcollections as well as discounts, allowances, and refunds are ordinarily made by the payee of the related expense. However, nothing in the regulations requires that the "amount paid back" come from the original payee. Kindred's argument focuses on the methodology used to reduce a cost, instead of whether there was a true "reduction of cost." Although examining the inflow and outflow of cash payments and the identity of the payor and payee will ordinarily establish the cost actually incurred, it will not necessarily always do so and Kindred's argument ignores the economic impact of participating in the pooling arrangement.

There is no doubt that the decisions cited by the Administrator are factually distinct. However, contrary to Kindred's suggestion, actual cost can not be computed by merely "following the money" or isolating the accounting events. Instead, the courts have allowed the Administrator to scrutinize the substance of the transaction to determine cost actually incurred. See, e.g., Albert Einstein Med. Ctr. v. Sebelius, 566 F.3d 368 (3rd Cir. 2009) (considering depreciation allowance); Creighton v. Omaha Regional Healthcare Corp., 950 F.2d 563 (8th Cir. 1991) (considering interest expense); Abbott-Northwestern Hospital, Inc. v. Schweiker, 698 F.2d 336 (8th Cir. 1983) (considering depreciation and interest expense). The Administrator's analysis of costs actually incurred is consistent with the approach taken by other circuits which do not examine transactions in a vacuum.

**Provider Contracts**

Kindred also argues that the decision is contrary to law because it disregards the terms of the contracts between the MSC and the pool participants. Kindred points out that the Administrator found that the pooling arrangement was the result of a voluntary, private contract and that this finding is at odds with the Administrator's decision that the payments were the "equivalent to tax refunds issued by the State of Missouri." Because Missouri has no control or authority over the pool payments, Kindred argues that the pool payments are not the equivalent of tax refunds.

Again, Kindred's argument focuses on an immaterial circumstance and ignores reality. The Administrator looked to the impact the pool payment had on Kindred's tax expenditures and determined that similar to a tax refund, the pool payment had the effect of reducing Kindred's FRA tax expense. The Administrator did not conclude that the pool payment constituted a tax refund, only that it acted like one. The validity of the private contract between the MSC and the provider hospitals is not jeopardized by the Secretary's treatment of the pool payment for the purpose of Medicare cost reporting. Cf. In Home Health, 188 F.3d at 1043 ( considering employment contracts to determine if physical therapists were "under an arrangement" or salaried employees).

Kindred suggests that the Administrator improperly considered the perceived motives of the parties to the pooling arrangement to determine the treatment of the pool payment and that the Administrator is not permitted to override a valid contract between the MSC and Kindred. Nothing in the Administrator's decision, however, changes the contractual relationship between the MSC and Kindred. The pool payments are not merely motivated by tax expenditures, they are calculated in accordance with the expenditures in

the formula for making such payments. (A.R. 61-67).

**PRM § 2302**

Kindred also takes issue with the Secretary's reliance on section 2302 of the Provider Reimbursement Manual. PRM § 2302.5 defines "applicable credits" as "those receipts or types of transactions which offset or reduce expense items that are allocable to cost centers as direct or indirect costs." Examples are then provided: "rebates," "recoveries or indemnities on losses," and "other income items which serve to reduce costs." Here, the Administrator relied on the "other income items which serve to reduce costs" as supporting its treatment of the pool payments. Kindred argues that the Administrator erred in looking to these provisions of the Provider Reimbursement Manual because: (1) the provisions of the PRM cannot trump the overcollection requirement of 42 C.F.R. § 413.98; (2) section 2302 of the PRM concerns record keeping requirements, not reimbursement rules; and (3) the provision addresses income, not revenue.

None of these arguments are convincing. The Administrator's reliance on the Provider Review Manual was only to show that the treatment of the pool payments was consistent with other provisions of the Medicare guidelines. It is true that the 2300 series of the PRM addresses record keeping requirements, not reimbursement principles. See Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 92-95 (1995). Nevertheless, that the provisions of the Provider Reimbursement Manual concern records, not reimbursement, do not make the provisions at odds with the Administrator's decision. Likewise, Kindred's argument that a distinction exists between income and revenue does not carry the day. Kindred's accountant explained: "[Pool payments] cannot be identified

with an individual patient and an individual service provided, they can't really be designated as patient service revenues and really relate to other revenue or income." (A.R. at 238).

**Decision Supported by Evidence**

Kindred next argues that the Administrator's decision is not supported by substantial evidence.

Kindred states the Administrator improperly considered the motivation underlying the pool contracts and also insinuated an improper partnership between the Missouri Hospital Association and the State of Missouri. Kindred emphasizes that the motivation for the pool contracts was to benefit Medicaid and uninsured patients, and the Administrator erroneously linked the State of Missouri and the Missouri Hospital Association. Kindred takes issue with the Administrator's findings that the FRA tax incurred by Kindred was the "direct cause of the pool payments made to it," and that the pool payment was "based on a formula, and each hospital's participation entitled it to relief from the pool in certain circumstances." Kindred says there can be no causation or entitlement because it participated in the pool contract voluntarily, without any assurance of benefit, and subject to the MSC's discretion.

These arguments are unavailing. The motivation and discretion underlying the pool contracts does not dictate the treatment of payments made from the pool for the purpose of the Cost Report. The pool contracts as well as the MSC worksheets establish the relationship between the FRA tax and the pool payments. The MSC's discretion in managing the pool does not change the character of the pool payments or cause me to conclude that the Administrator's decision to reduce Kindred's tax expense by the amount of the pool payments was not supported by the record evidence.

**Donations**

Kindred also argues that there is no evidentiary support for the Administrator's decision that the pool payments were not donations or unrestricted grants from hospital to hospital. Kindred says there is not substantial evidence that the pool contributions were not unconditional. Kindred points to evidence from the pool contracts that it had no control or authority to determine the amount of funds withheld by the MSC from the State's checks and the amount reallocated could change, sometimes on short notice, and that participants were required to give 180 days notice of withdrawal from the pool, "so a provider is contractually committed to remain in the pool for an extended period regardless of any financial outcome."

The Administrator's decision that the pool payments were not donations or unrestricted grants from hospital to hospital is supported by the record evidence. First, the hospitals recorded the pool payments as revenue, not as gifts or unrestricted grants. Second, the pool payments were the byproduct of the pool contract and the existence of the contract itself refutes the argument that the payments were unconditional gifts or transfers.

The issues presented in this case are somewhat reminiscent of a collateral source argument between parties in a personal injury case. A defendant (like the Secretary here), may argue that a collateral source payment mitigates plaintiff's damages (like the pool payment mitigates the tax burden). However, a personal injury plaintiff responds that reducing damages by the collateral source payment is against public policy. In this case, Kindred has failed to show any statutory or regulatory basis for disregarding the plain fact that the pool payments reduced its overall tax burden. For the reasons stated herein, I find

no basis in law for disregarding the tax-related nature of the pool payments that Kindred would have me divorce from the FRA tax expenditure and treat as unrelated revenue.

**Arbitrary, Capricious or Abuse of Discretion**

Kindred's final argument is that the decision was arbitrary, capricious and an abuse of discretion. Kindred says that the decision is internally inconsistent and illogical and uses one provision of the Medicare law to "reverse-engineer" a result withheld by Congress under another provision. See, e.g., St Luke's Methodist Hospital v. Thompson, 315 F.3d 988, 989 (8th Cir. 2003) (refusing to uphold a categorical denial of an upward adjustment for costs that would have been reimbursed under previous interpretation).

Kindred states that the Administrator erroneously relied on the fact that Missouri did not report the MSC pool payments on a Form 1099 as Medicaid revenue as support for its decision. Kindred argues that the absence of a Form 1099 is not surprising as it only confirms that the State had no involvement with the pool. Although there is some merit to Kindred's explanation for the lack of a 1099, the 1099 evidence was not the linchpin of the Administrator's decision, and does not make the ruling arbitrary, capricious, or an abuse of discretion. Likewise, Kindred's argument that the Administrator's decision is inconsistent because payments into the pool are not treated as an allowable Medicare expense is equally unavailing. The question of the treatment of contributions to the pool is not an issue in this case.

Finally, Kindred argues that the Secretary, through the Administrator's decision, is attempting to deploy a Medicaid rationale to resolve a matter of Medicare cost reimbursement. Kindred directs this court to the battle history between the Secretary and the State of Missouri and suggests that this is a "result-orientated" and "unprincipled

manipulation" of Medicare cost reimbursement.  Northwest Hosp., Inc. v. Hospital Svs. Corp., 687 F.2d 985, 991 (8th Cir. 1982) (" Medicare statute specifically circumscribes the Secretary's discretion to define reasonable costs . . . by prohibiting her from causing costs properly allocable to Medicare patients to be borne by non-Medicare patients"). Specifically, Kindred states that the Administrator is misappropriating a Medicaid hospital revenue stream to arbitrarily reduce the cost of the FRA taxes for the benefit of Medicare, and that this purpose violates the statutory mandate that non-Medicare payors do not subsidize the care of Medicare patients.  Kindred's argument, however, goes well beyond the standard of review and requires ignorance of the pool contracts and methodology. The Administrator's decision is supported by substantial evidence in the record and is not an abuse of discretion, arbitrary, or capricious.

Accordingly, I affirm the decision of the Secretary of the United States Department of Health and Human Services that the pool payments constitute a reduction of Kindred's FRA tax expense for the years in question.  However, to the extent that there is a mathematical error, as outlined in footnote one of this opinion, the decision is remanded to the Administrator with instructions to consider the adjustments necessary to correct the mathematical error in Kindred's favor.    **SO ORDERED**.

/s/ Howard F. Sachs
Howard F. Sachs
United States District Judge

October  5 , 2011

Kansas City, Missouri